```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

COZEN O'CONNOR, P.C.,           )
                                )
                Plaintiff,      )
                                )
     v.                         )    No.  05 C 5264
                                )
ASPERGER CARAHER LLC,           )
                                )
                Defendant.      )
```

                     MEMORANDUM OPINION AND ORDER

    Cozen O'Connor, P.C. ("Cozen") brought this diversity action seeking a declaratory judgment as to its rights vis-a-vis defendant Asperger Caraher, LLC ("Aspcar") to legal fees arising from matters that various clients have transferred to Cozen from Aspcar after the latter firm's dissolution ("Transferred Matters").  To streamline this litigation, Cozen has filed a motion under Fed. R. Civ. P. ("Rule") 16 for resolution of certain issues as a matter of law.

    More specifically, Cozen seeks a ruling that either according to the terms of the dissolution agreement between Aspcar's partners ("Agreement") or under quantum meruit principles Aspcar is entitled to fees from the Transferred Matters only for Aspcar's reasonable hours and expenses invested before the transfers.  In response Aspcar (1) asserts multiple defenses against the enforcement of the Agreement and (2) argues for a more expansive measurement of quantum meruit fees.

    For the reasons stated in this memorandum opinion and order,

Cozen's motion is granted. This Court holds that Aspcar's compensation for the Transferred Matters is limited to the amounts provided for in the Agreement.

## Standard of Review

Resolution of issues as a matter of law under Rule 16 is directly analogous to a Rule 56(d) proceeding in the summary judgment area--but only as to those issues, not as to the entire case (see 6A Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d §1529, at 299-301 (2d ed. 1990)). For that reason the parties' filings have conformed to this District Court's procedures as to Rule 56 motions,[1] and this opinion will apply the familiar Rule 56 principles to frame the legal analysis.

Those principles impose on the movant the burden of establishing a lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.

---

[1] This District Court's LR 56.1 implements Rule 56 by requiring the submission of evidentiary statements and responses to such statements to highlight which facts are in dispute and which are not. This opinion will cite to Cozen's LR 56.1 statement as "C. St. ¶--" and its August 7, 2006 memorandum of law as "C. Mem." and will cite to Aspcar's LR 56.1 responsive statement as "A. St. ¶--," its LR 56.1 statement of additional facts as "A. Add'l St. ¶--" and its responsive memorandum as "A. Mem."

2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)).  Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Finally, as a federal court sitting in diversity this Court is charged with applying state law--in this instance Illinois law, as the parties agree--to resolve all substantive questions (M.T. Bonk Co. v. Milton Bradley Co., 945 F.2d 1404, 1407 (7th Cir. 1991)).  What follows, then, is (1) a summary of the facts as viewed in the light most favorable to Aspcar, but only so far as those facts are supported by record evidence, followed by (2) an application of Illinois substantive law to those facts.

## Background

Aspcar's sole shareholders have been Jeffrey Asperger ("Asperger") and Kevin Caraher ("Caraher") (C. St. ¶4).  Aspcar's "Operating Agreement" confirms that Asperger was at all times the majority partner with the tie-breaking vote in all firm matters (C. St. ¶¶7-9).[2]  In mid-October 2004 Asperger notified Caraher

---

[2] Because A. St. ¶¶7-9 merely defer to this Court's interpretation of the Operating Agreement without even attempting to provide Aspcar's supposedly contrary interpretation of that document, its attempted denials of Cozen's assertions are not proper under LR 56.1.  Hence the C. St. ¶¶7-9 version of the

3

that he was dissolving Aspcar, and the two partners engaged in negotiations as to the terms of their severance--a negotiation that culminated in the execution of the Agreement on November 11, 2004 (A. Add'l St. ¶¶8, 10, 11; C. St. ¶6). Agreement ¶¶7 and 8 dealt with the allocation of fees from Aspcar's former client matters, including the Transferred Matters, as between Aspcar and any successor firms (C. St. ¶6):

> 7) ...any attorney fees recovered in a pure contingent fee (fixed or sliding scale) file shall be distributed quantum meruit in accordance with the reasonable time and hourly rates in effect on said file while the matter was being handled by Aspcar. Any future fees and expenses incurred or recovered after all hourly time and expenses invested by Aspcar have been brought current shall accrue to the firm handling the file after the date of dissolution.
>
> 8) ...any additional fees recovered on the Craig I/S files (e.g. Malkin or Sudler) shall be for the account of Aspcar until all of the hourly time and expenses incurred by Aspcar as of the date of dissolution are fully paid. Any future fees and expenses recovered after all hourly time and expenses invested by Aspcar have been brought current shall accrue to the firm handling the file after the date of dissolution.

After Aspcar's dissolution Caraher obtained employment with Cozen, and several clients who had been with Aspcar chose to bring to Cozen the Transferred Matters for which Caraher had been responsible (A. Add'l St. ¶3; C. St. ¶5). Cozen then brought

---

facts is deemed admitted (see Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003)). Moreover, even a cursory review of the document confirms the accuracy of the Cozen assertions.

this action to determine how the fees from those Transferred Matters should be allocated between itself and Aspcar (C. St. ¶5). Cozen avers that as the successor firm on the Transferred Matters it is a third-party beneficiary of the Agreement, so that the fees should be allocated between Aspcar and itself as Agreement ¶¶7 and 8 specify.

For its part Aspcar counters that the Agreement should not be enforced because in the course of negotiations Caraher made several material misrepresentations of fact about the status and value of the Transferred Matters, fraudulently inducing Asperger to enter into the Agreement (A. Add'l St. ¶¶8, 15-22, 30-32, 38). Aspcar also advances a duress argument based on Caraher's presentation of the final draft of the Agreement for Asperger's signature sometime after 9 p.m. on November 11 (A. Add'l St. ¶11). According to Aspcar, Caraher took advantage of Asperger's exhaustion from the effects of chemotherapy and trial preparation by presenting him with the Agreement when Asperger was not able to review the Agreement properly and to represent his own interests (A. Add'l St. ¶11; A. Mem. 10-12). As Aspcar has it, Caraher was motivated to misinform Asperger about the recovery value of the Transferred Matters and to take advantage of Asperger's compromised position so that he could entice Cozen to bring him on with a cherry-picked book of valuable business (A.

5

Add'l St. ¶¶3, 4, 5, 12).[3]

## Fiduciary Relationship

Throughout its submissions Aspcar seeks to hold Caraher to a higher standard of conduct by adverting to fiduciary duties that Caraher assertedly owed to Asperger. That effort fails as a matter of law.

While all partners are each other's fiduciaries in an active partnership, <u>Hamilton v. Williams</u>, 214 Ill.App.3d 230, 247-48, 573 N.E.2d 1276, 1288 (2d Dist. 1991)(citations omitted) has succinctly summarized Illinois law as to the partners' relationship at the time of dissolution:

> Dissolution of the partnership ends the fiduciary relationship except for purposes of an accounting or the winding up of the partnership's affairs. The partnership relationship does not extend to all affairs and transactions between partners, however, and when the partners have entered into an arm's length transaction in order to effect dissolution, their relationship is not fiduciary in nature.

Even though the Agreement that memorialized the specific terms of the partners' severance and set the record date of dissolution was not executed until November 11, Aspcar's dissolution was actually initiated by Asperger's October notification to Caraher that he was dissolving the firm (<u>Babray v. Carlino</u>, 2 Ill.App.3d 241, 251, 276 N.E.2d 435, 442 (1st Dist. 1971); A. Add'l St. ¶3). That being so, the negotiations leading to the Agreement were

---

[3] This opinion will also refer to additional facts as they become relevant to the ensuing discussion.

part of an arm's length transaction in which neither partner owed the other fiduciary duties.

### Fraudulent Inducement

Aspcar next attempts to avoid the terms of the Agreement by claiming that Caraher induced Asperger to agree to them by fraudulently misrepresenting the status of the Transferred Matters. Such cases as <u>Fogel v. Enter. Leasing Co. of Chicago</u>, 353 Ill.App.3d 165, 171, 817 N.E.2d 1135, 1140 (1st Dist. 2004) instruct that to obtain rescission of the Agreement based on assertedly fraudulent misrepresentation, Aspcar must present facts to demonstrate:

> (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intended to induce the other party to act; (4) acted upon by the other party in reliance upon the truth of the representations; and (5) damaging to the other party as a result.

Thus Aspcar's first hurdle is to identify record evidence of some false statement of fact by Caraher relevant to execution of the Agreement. But the following analysis reveals that it has simply failed to do so.

All of Caraher's asserted misrepresentations (as Aspcar would have it) came in his responses to Asperger's inquiries into the status of the Transferred Matters. This opinion will address them one matter at a time.

First, even apart from the hearsay problem posed by the record support Aspcar proffers for A. Add'l St. ¶34, what Aspcar

7

suggests as to the "Grillo" case cannot fairly be termed a misrepresentation at all (A. Add'l St. ¶¶33-35; A. Mem. 7). All that is attributed to Caraher is the statement "the client was seeking $750,000 in settlement"--and on the evidence that is just what happened (A. Add'l St. ¶¶33, 35).

Next, as to the "Japan Foods" case all that Caraher said was "he had no opinion of the value or potential of" that matter (A. Add'l St. ¶38). Other than a claim that Caraher did not honestly hold that position--an assertion for which there is no evidentiary support at all--that statement cannot be construed as a misrepresentation of anything.

Caraher's purported misrepresentations as to the "Malkin," "Mitsubishi" and "Industrial Developments" cases do not support a claim for Aspcar for the reason set out in such cases as <u>James v. Lifeline Mobile Medics</u>, 341 Ill.App.3d 451, 456, 792 N.E.2d 461, 465 (4th Dist. 2003):

> Ordinarily, erroneous statements as to matters of opinion, such as representations of the value of property, do not amount to fraud avoiding a contract made in reliance thereon.[4]

Thus Caraher's statements that the Mitsubishi and Industrial Developments matters had "little or no potential" and that in the Malkin case "the evidence was weak, there was a poor opportunity

---

[4] [Footnote by this Court] <u>James</u> goes on to identify an exception to the quoted principle (something that accounts for the opinion's use of the qualifier "Ordinarily")--but by its terms that exception is plainly inapplicable to this case.

for recovery and that it was unlikely the target recovery of $1,260,000 would be met" are all opinions and predictions, rather than statements of material fact. Such "statements regarding the future profitability of an endeavor are not statements of material fact" (Power v. Smith, 337 Ill.App.3d 827, 832-33, 786 N.E.2d 1113, 1119 (4th Dist. 2003)), and with limited exceptions "the law will not support a misrepresentation claim predicated on an opinion" (Schrager v. North Cmty. Bank, 328 Ill.App.3d 696, 704, 767 N.E.2d 376, 382 (1st Dist. 2002)).

Those few exceptions do not apply here. As Duhl v. Nash Realty Inc., 102 Ill.App.3d 483, 489, 429 N.E.2d 1267, 1272 (1st Dist. 1982) instructs:

> [W]here the representation as to value is not a mere expression of opinion but is made as a statement of fact for the listener to rely upon, the representation is treated as a statement of fact and the speaker is bound thereby.

In further explanation Duhl, id. at 490, 429 N.E.2d at 1273 quotes from Prosser, Handbook of the Law of Torts §109, at 726-27 (4th ed. 1971):

> [T]he expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it. There is quite general agreement that such an assertion is to be implied where the defendant holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff, so that his opinion becomes in effect an assertion summarizing his knowledge. Thus the ordinary man is free to deal in reliance upon the opinion of an expert jeweler as to the value of a diamond, of an attorney upon a point of

9

> law, of a physician upon a matter of health, of a banker upon the validity of a signature, or the owner of land at a distance as to its worth, even though the opinion is that of his antagonist in a bargaining transaction.

While it is not entirely clear from Aspcar's submissions, it appears that it must be trying to fit those statements of attorney Caraher about the potential outcome and value of the cases into that exception. Whether an asserted misrepresentation is one of fact is itself a question of law (see Power, 337 Ill.App.3d at 830, 786 N.E.2d at 1117)--and this Court holds that Caraher's statements do not fit into that narrow category.

Duhl deals with the situation where one party with special knowledge, such as a real estate broker, holds himself out to people outside of his field as a professional whose opinion as to matters within the area of his expertise--property value in the case of a broker--can be relied upon in making such decisions as contracting to buy or sell property. Aspcar's less-than-clear argument must therefore run along that line--a contention that when Caraher made statements as an attorney about the value of a case he was essentially warranting that in his professional opinion the facts of the case supported his honest judgment, especially when the files were incomplete so as to make independent verification more difficult. While that line of argument would be persuasive where an attorney provides legal advice to a layperson, it does not hold up in the entirely

10

different scenario of an attorney providing his opinion of a case to another attorney, even his own partner.

To adapt Power, 337 Ill.App.3d at 833, 786 N.E.2d at 1119 to this case, the question is:

> Were [Caraher's] representations here similar to representations of value made by a realtor after an appraisal? Or were they more similar to the representations one partner makes to another in deciding to take on a new client or product line, that "I think [or do not think] we can make money on this." It will be a fundamental change in the law of business relationships if business people become the guarantors of all projects they bring into [or reject for] the firm.

Even though Caraher was in charge of the disputed cases and Asperger looked to him to provide information about them due to the incomplete nature of the files, Caraher did not have the type of special knowledge vis-a-vis Asperger to allow Asperger to treat Caraher's predictions as to the value of those cases as a matter of fact. Asperger was an experienced attorney. He surely knew what questions to ask--to cross-examine, so to speak--to substantiate or not substantiate Caraher's opinions so that Asperger could make his own independent professional judgment as to the value of those cases.

Indeed, if Asperger needed more time for those questions, or to attempt to investigate further the status of those cases when his strength was up to it, it was entirely within his power and expertise to delay the signing of the Agreement or to reach no agreement at all. It should not be forgotten that Asperger was

the majority partner with the controlling vote in all firm matters.

Given all of the complexities and variables involved in estimating the settlement or judgment value of litigation, it is that much more unreasonable for an experienced attorney such as Asperger[5] to treat another attorney's valuation as a matter of fact. Indeed, the Malkin matter, the only case with some objective evidence about its actual value that could bear upon Caraher's opinions, ended up settling for more than the target value only after Cozen took the risk of taking the case to trial (A. Add'l St. ¶¶31, 32). To adapt Power, 337 Ill.App.3d at 833, 786 N.E.2d at 1119 to this case once again:

> [Asperger] was an experienced [attorney], perhaps with more experience in management and financial aspects than [Caraher] had....[Asperger] and [Caraher] did not stand in a relation similar to that of purchaser of real estate and real estate broker.

In sum, Caraher's statements regarding the Malkin, Mitsubishi and Industrial Developments cases do not amount to statements of material facts that could serve as the basis for a claim of fraud. Asperger strikes out on that facet of his fraudulent inducement claim.

Finally Aspcar claims that Caraher fraudulently concealed

---

[5] According to Sullivan's Law Directory, Asperger was 52 at the time of dissolution (four years older than Caraher) and had then been practicing law for 25 years (two years longer than Caraher).

12

from Asperger the fact that he had not negotiated a "Phase II" prosecution agreement with the client in the "Burnham Park" (a/k/a "Sudler") case (A. Add'l St. ¶¶19-22).[6] To support such a claim of fraudulent concealment, Aspcar must show that Caraher "concealed a material fact when [he] was under a duty to disclose to [Asperger]" (W.W. Vincent & Co. v. First Colony Life Ins. Co., 351 Ill.App.3d 752, 762, 814 N.E.2d 960, 969 (1st Dist. 2004)). Aspcar has failed that requirement: It has presented no factual support for the notion that Caraher had any special or fiduciary duty to disclose that assertedly material information to Asperger (contrast Thornwood, Inc. v. Jenner & Block, 344 Ill.App.3d 15, 25, 799 N.E.2d 756, 765 (1st Dist. 2003)).

To begin with, it has already been established that Caraher did not owe Asperger any fiduciary duties, including a duty to disclose, in the arm's length negotiations leading to the Agreement. Moreover, Aspcar has also not pointed out a statement by Caraher amounting to a "half-truth" that created a duty of further disclosure to prevent that "half-truth" from becoming materially misleading (see W.W. Vincent, 351 Ill.App.3d at 762, 814 N.E.2d at 969). Hence Aspcar has not made a case for fraudulent concealment either.

---

[6] Originally Aspcar had also charged that before the execution of the Agreement Caraher was actively involved in transferring the case to Cozen. After Cozen's response showed that to be untrue, Aspcar withdrew that charge.

13

Even if all of this did not suffice to torpedo Aspcar's fraudulent misrepresentation defense--and it clearly does--Aspcar's theory would fail anyway, for any claimed reliance on Caraher's statements on Asperger's part was not justifiable (see, e.g., Schrager, 328 Ill.App.3d at 703, 767 N.E.2d 382). To justify such reliance, "the representations must be viewed in the light of all the facts of which the party injured had actual knowledge and also such as he might avail himself of by the exercise of ordinary prudence" (Halla v. Chicago Title & Trust Co., 412 Ill. 39, 47, 104 N.E.2d 790, 794 (1952)). As a matter of law, "[i]f an ample opportunity to discover the truth of the representations existed, then reliance on them was not justified" (Nat'l Republic Bank of Chicago v. Nat'l Homes Constr. Corp., 63 Ill.App.3d 920, 924-25, 381 N.E.2d 15, 19 (1st Dist. 1978)). Those principles might have been coined to fit Asperger--and that serves as another and independent ground for rejecting Aspcar's fraud defense.

To summarize, Aspcar has not directed this Court's attention to any misrepresentations of material fact that could sustain a defense of fraudulent misrepresentation or inducement. Aspcar also cannot avoid the terms of the Agreement on that ground.

## Duress Defense

As a second theory to preclude enforcement of the Agreement, Aspcar seeks refuge under the equitable doctrine of duress. But

14

once again analysis defeats its contention--that string to its bow is broken as well.

In Illinois (as elsewhere) a contract is voidable "where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will" (Kaplan v. Kaplan, 25 Ill.2d 181, 185, 182 N.E.2d 706, 709 (1962)). Though such acts or threats must be wrongful to create the necessary conditions for duress, "the rule is not limited to acts that are criminal, tortious or in violation of a contractual duty, but extends to acts that are wrongful in a moral sense" (id. at 186, 182 N.E.2d at 709). Even so, those acts must have "left the individual bereft of the quality of mind essential to the making of a contract" (id.).

In sum, Aspcar asserts that Caraher's wrongful act was his effort to take advantage of Asperger's compromised physical condition by presenting him with the disputed Agreement for the first time when Cozen knew that due to his misrepresentations concerning the Transferred Matters, the incompleteness of the files and Asperger's exhaustion from chemotherapy, Asperger would be pressured into consenting to terms to which he would not otherwise have agreed (see A. Mem. 10, A. Add'l St. ¶¶2, 9-11). In line with its citation of Huebert v. Marshall, 132 Ill.App.2d 793, 796, 270 N.E.2d 464, 467 (1st Dist. 1971), Aspcar's facts are most likely sought to be aligned with a theory of "moral

15

duress." In an articulation more recently adopted in <u>Golden v. McDermott, Will & Emery</u>, 299 Ill.App.3d 982, 993, 702 N.E.2d 581, 588 (1st Dist. 1998), <u>People ex rel. Buell v. Bell</u>, 20 Ill.App.2d 82, 95, 155 N.E.2d 104, 111 (2d Dist. 1959) had described that theory as involving:

> imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another, and relief is granted in such cases on the basis that the party benefiting thereby has received money, property, or other advantage which in equity and good conscience he should not be permitted to retain.

Despite Asperger's trying circumstances, Aspcar has not presented facts that can fit that exceptional situation. Nothing in the record explains why Asperger, an experienced attorney who was concurrently capable of actively representing clients and who had the unfettered power to veto any partnership decisions, would not or could not have simply refused to sign the Agreement and told Caraher that they would deal with it on another day--or, indeed, not at all (see C. St. ¶¶7-9, A. Add'l St. ¶11).

To put matters a bit differently, there is simply no evidence that Asperger lacked the state of mind essential to making a contract. As <u>Golden</u>, 299 Ill.App.3d at 992-93, 702 N.E.2d at 588 has said, "[r]eported Illinois opinions have only found moral duress in extreme circumstances"--and the examples cited there are not at all analogous to the bargaining position of an experienced and "legally sophisticated attorney" (a

16

description that the Illinois Appellate Court applied to Golden, and that applies equally to Asperger). Neither moral duress nor duress by any other theory provides grounds for Aspcar to avoid enforcement of the Agreement.[7]

### Agreement's Lack of Ambiguity

In a final attempt to extricate itself from the Agreement, Aspcar argues that Agreement ¶¶7 and 8 are ambiguous and should therefore be construed against Caraher, the drafter of those paragraphs (A. Add'l St. 11). In Illinois "[t]he question of whether a contract is ambiguous is a question of law to be determined by the court, and an ambiguity can be found only if the language is reasonably or fairly susceptible to more than one construction" (Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd., 146 Ill.App.3d 684, 689, 500 N.E.2d 431, 434 (1st Dist. 1986) (citation omitted)). Aspcar flunks that test.

Instead of focusing on the challenged language in the Agreement, Aspcar attempts to point to parol evidence of the firm's varied and detailed fee agreements with its clients to suggest an ambiguity--it fails utterly to suggest what arguably alternative constructions of the contractual language show any

---

[7] Aspcar's Answer had also asserted the doctrine of unclean hands as a defense to enforcement of the Agreement. Even apart from this Court's having found no wrongdoing by Caraher that could be the basis for such a defense, Aspcar has not argued that theory in response to Cozen's motion and has thus forfeited that defense (see, e.g., Ryan v. Chromalloy Am. Corp., 877 F.2d 598, 603-04 (7th Cir. 1989)).

17

ambiguity in its meaning (A. Mem. 12-13). Instead the parties created a straightforward across-the-board standard to apply to the diverse fee arrangements. Nor does the Agreement's reference to quantum meruit create an ambiguity--to the contrary, measuring quantum meruit in terms of the "reasonable time and hourly rates" is an appropriate standard under Illinois law (C. St. ¶6; see, e.g., Johns v. Klecan, 198 Ill.App.3d 1013, 1021, 556 N.E.2d 689, 694 (1st Dist. 1990)).

Aspcar thus strikes out on its final time at bat as well. Agreement ¶¶7 and 8 are unambiguous and govern the respective rights of Aspcar and Cozen to fees due on the Transferred Matters.

## Conclusion

Because Aspcar has failed to demonstrate a genuine issue of material fact as to the legal issues Cozen has requested this Court to resolve, Cozen's motion is granted in its entirety. First, Aspcar's rights to fees due on the Transferred Matters are provided for in Agreement ¶¶7 and 8. Second, those paragraphs entitle Aspcar to the reasonable hourly rates and expenses invested in the Transferred Matters to and including November 11, 2004, the date of dissolution stated in the Agreement. In that last respect, because Aspcar has admitted that it had an hourly fee arrangement in the "Dillon" matter upon which it has no outstanding lien, Aspcar is not entitled to any further

18

compensation on that matter (C. St. ¶¶23-25). Finally, this action is set for a status hearing at 9 a.m. November 14, 2006 to discuss further proceedings in this action.[8]

```
                              _____
                              Milton I. Shadur
                              Senior United States District Judge
```

Date: November 6, 2006

---

[8] Cozen has contended that Aspcar's failure to have provided information as to unreimbursed expenses and time charges as to the Mitsubishi, Grillo, Sudler, Japan Foods and Industrial Developments matters calls for a declaration that Aspcar has no financial entitlement on any of those matters (see C. Mem. 11). No ruling is made or implied here in that respect, it being anticipated that Cozen's contention will be among the subjects discussed at the next status hearing.

19